# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT CINCINNATI

CHAUNCEY YARBROUGH,

                       Petitioner,             :    Case No. 1:13-cv-443

   - vs -                                  District Judge Michael R. Barrett
                                        Magistrate Judge Michael R. Merz

ERNIE MOORE, WARDEN,
  Lebanon Correctional Institution,

                                  :

                    Respondent.

# REPORT AND RECOMMENDATIONS

Petitioner Chauncey Yarbrough brought this habeas corpus action *pro se* under 28 U.S.C. § 2254 to obtain relief from his convictions in the Hamilton County Common Pleas Court on two counts of murder, two counts of carrying a concealed weapon, and one count of having a weapon under disability (Petition, Doc. No. 1, PageID 1, ¶ 5). He pleads five grounds for relief as follows:

> **Ground One:** Conviction is not based on evidence beyond a reasonable doubt, and is Constitutionally insufficient.
>
> **Supporting Facts:** The evidence presented does not prove beyond a reasonable doubt that the Petitioner purposely caused the death of the victim, Marcus Mitchell, AKA "Murder" and the Petitioner was in fact operating in self-defense. Absolutely no evidence exists that he killed the second victim, who was behind a 14 foot retaining wall. These facts are supported by the Trial Court Judge's lengthy review and delay in rendering a verdict. The Court intermittently sent E-mail to both Counsel during the months between the presentation of the case and the subsequent verdict, asking for further argument of finding of guilt on a lesser charge than murder. This fact demonstrates ample reasonable doubt and

1

shows that the evidence was Constitutionally insufficient, making the resulting conviction a violation of the 5th and 14th Amendments.

**Ground Two:**  Ineffective Assistance of Trial Counsel

**Supporting Facts:**  Counsel failed to properly cross-examine and impeach both the Coroner and the Firearm Expert, to prove that the deaths were in no way related to each other. Counsel erroneously chose to forego any defense of the murder charge concerning Mr. Phillips, by hoping for an acquittal concerning "Murder", based on self-defense. Counsel never asked any questions of the Coroner of Firearms Expert concerning the death of Dante Phillips, completely abandoning his duty to the Petitioner under the 6th Amendment, which results in a violation of his rights under both the 5th and 14th Amendments.

**Ground Three:**  Prosecutorial Misconduct

**Supporting Facts:**  The Prosecutor in essence "Paid" its witnesses with special consideration in their own cases, and then failed to fully reveal the deals made in exchange for their testimony, in violation of the 6th Amendment Confrontation Clause, Brady, Criminal Rule 16 and the petitioner's Rights to Due Process and a Fair Trial, guaranteed by the 5th 6th and 14th Amendments of the U.S. Constitution.

**Ground Four:**  Involuntary Waiver of Jury Trial

**Supporting Facts:**  Due in part to the State's failure in Discovery to reveal the deals made with its witnesses in exchange for favorable testimony, this failure caused the Petitioner's decision to be not knowing, intelligent or voluntary, and violated his Constitutional Rights to Due Process and a Fair Trial under the 5th and 14th Amendments.

**Ground Five:**  The Trial Court improperly denied the Petitioner's New Trial Motion (Egregious Evidentiary Ruling)

**Supporting Facts:**  An actual eyewitness came forward through an Affidavit, claiming that he saw "Murder's" gun, and saw him reach for it. Also attached was the evidence of the deals made by the State with its witnesses, and additional evidence that the evidence was insufficient to support the conviction. Yet, despite overwhelming factors in favor of the granting of the Motion, the Court overruled it, by abuse of discretion, and severely violated the Petitioner's Right to a

2

Fair Trial and the Due Process of Law, guaranteed by the 5th and 14th Amendments.

(Petition, Doc. No. 1).

## Procedural History

Yarbrough was indicted for the murders of Marcus Mitchell and Daunte Phillips which occurred outside Annie's nightclub in 2009. The murder charges were accompanied by firearm specifications and weapons counts noted above. Yarbrough waived his right to a jury trial and was convicted by Judge Nadine Allen on all counts. After verdict, Yarborough moved for a new trial, offering Kenneth Davis as a newly-discovered witness and complaining of inducements offered to witnesses Willie Smith and Marvin Gates by the State. Judge Allen denied the motion and Yarbrough appealed to the First District Court of Appeals which affirmed the judgment. *State v. Yarbrough*, 2012-Ohio-2153, 2012 Ohio App. LEXIS 1918 (1st Dist. May 16, 2102). The Ohio Supreme Court declined jurisdiction over a subsequent appeal. This habeas corpus petition followed.

## Generally Applicable Law

When a state court decides on the merits a federal constitutional claim later presented to a federal habeas court, the federal court must defer to the state court decision unless that decision is contrary to or an objectively unreasonable application of clearly established precedent of the United States Supreme Court. 28 U.S.C. § 2254(d)(1); *Harrington v. Richter,* 562 U.S. ___, 131 S.Ct. 770, 785 (2011); *Brown v. Payton,* 544 U.S. 133, 141 (2005); *Bell v. Cone,* 535 U.S. 685,

693-94 (2002); *Williams (Terry) v. Taylor*, 529 U.S. 362, 379 (2000);  *Bell v. Howes*, 703 F.3d 848 (6th Cir. 2012).

> [*Harrington v.*]*Richter* and *[Early v.] Packer* appear to require AEDPA deference where a federal issue has been raised but the state court has denied the claim with a discussion solely of state law. See *Childers v. Floyd*, 642 F.3d 953, 968-69 (11th Cir. 2011). The Supreme Court has recently granted certiorari in a case that may definitively resolve this issue. See *Cavazos v. Williams*, 132 S. Ct. 1088, 181 L. Ed. 2d 806 (2012).

*Moreland v. Bradshaw*, 699 F.3d 908, 931 (6th Cir. 2012).  As Hertz and Liebman acknowledge in the 2014 Supplement to their treatise, *Harrington* requires federal courts to presume a state court decision was an adjudication on the merits of the federal claim if it decides that claim, even if it gives no explanation at all.  Supplement at 146.  And in its later case, *Johnson v. Williams*, 133 S. Ct. 1088 (2013), the Supreme Court held the presumption would apply if the state law standard is "at least as protective as the federal standard."  *Id.*  at 1096.

.

The reasonableness of the state court decisions must be measured against Supreme Court precedent as of the time the state court enters its decision.  *Gover v. Perry*, 698 F.3d 295, 304 (6th Cir. 2012), *citing Greene v. Fisher*, 565 U.S. ___, 132 S. Ct. 38 (2011).

"[A] state court's application of federal law is unreasonable 'only if reasonable jurists would find it so arbitrary, unsupported or offensive to existing precedent as to fall outside the realm of plausible credible outcomes.'" *Hill v. Mitchell*, 2013 U.S. Dist. LEXIS 45919, at *28 (S. D. Ohio Mar. 29, 2013), *quoting Barker v. Yukins*, 199 F.3d 867, 872 (6th Cir. 1999).

"[T]he AEDPA standard is 'difficult to meet, because the purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice system, and not as a means of error correction.'  This interpretation of the AEDPA

standard appears to grant much more deference to state decisions when we review them under AEDPA than the earlier interpretation in *Williams v. Taylor . . .*" *Peak v. Webb*, 673 F.3d 465, 474 fn12 (6th Cir. 2012)(Merritt, J., concurring), *quoting Greene v. Fisher*, 565 U.S. ___, 132 S. Ct. 38(2011)(unanimous opinion); *Jackson v. Houk*, 687 F.3d 723, 738 (6th Cir. 2012), again quoting *Greene*.

The Supreme Court has elaborated on the standard of review of state court decisions on claims later raised in federal habeas corpus:

> The Antiterrorism and Effective Death Penalty Act of 1996 modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas "retrials" and to ensure that state-court convictions are given effect to the extent possible under law. See *Williams v. Taylor,* 529 U.S. 362, 403-404, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). To these ends, § 2254(d)(1) provides:
>
> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."
>
> As we stated in *Williams,* § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. 529 U.S., at 404-405, 120 S.Ct. 1495. A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. *Id.,* at 405-406, 120 S. Ct. 1495. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. *Id.,* at 407-408, 120 S.Ct. 1495. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams* that an unreasonable

application is different from an incorrect one.  *Id.,* at 409- 410, 120 S.Ct. 1495.   See also *id.,* at 411, 120 S.Ct. 1495 (a federal habeas court may not issue a writ under the unreasonable application clause "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly").

*Bell v. Cone*, 535 U.S. 685, 693-94 (2002).

AEDPA [the Antiterrorism and Effective Death Penalty Act of 1996] provides that, when a habeas petitioner's claim has been adjudicated on the merits in state-court proceedings, a federal court may not grant relief unless the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A state-court decision is contrary to this Court's clearly established precedents if it applies a rule that contradicts the governing law set forth in our cases, or if it confronts a set of facts that is materially indistinguishable from a decision of this Court but reaches a different result. *Williams v. Taylor, supra,* at 405; *Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) *(per curiam)*. A state-court decision involves an unreasonable application of this Court's clearly established precedents if the state court applies this Court's precedents to the facts in an objectively unreasonable manner. *Williams v. Taylor, supra,* at 405; *Woodford v. Visciotti,* 537 U.S. 19, 24-25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) *(per curiam)*.

*Brown v. Payton,* 544 U.S. 133, 134 (2005).

Because AEDPA permits granting the writ only when the state court acts unreasonably, the more general the rule at issue – and thus the greater the potential for reasoned disagreement among fair-minded judges - the more leeway state courts have in reaching outcomes in case-by-case determinations. *Renico v. Lett,* 559 U.S. 766, 767 (2010), *quoting Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity."  *Id.*

**Ground One:  Insufficiency of the Evidence**

      **Legal Standard**

In his first ground for relief, Yarbrough claims his conviction for the murder of Marcus Mitchell is unsupported by sufficient evidence.

An allegation that a verdict was entered upon insufficient evidence states a claim under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Jackson v. Virginia*, 443 U.S. 307 (1979); *In re Winship*, 397 U.S. 358 (1970); *Johnson v. Coyle*, 200 F.3d 987, 991 (6th Cir. 2000); *Bagby v. Sowders,* 894 F.2d 792, 794 (6th Cir. 1990)(en banc). In order for a conviction to be constitutionally sound, every element of the crime must be proved beyond a reasonable doubt.  *In re Winship*, 397 U.S. at 364.

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt . . . .  This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson*, 443 U.S. at 319; *United States v. Paige,* 470 F.3d 603, 608 (6th Cir. 2006); *United States v. Somerset*, 2007 U.S. Dist. LEXIS 76699 (S.D. Ohio 2007).  This rule was recognized in Ohio law at *State v. Jenks*, 61 Ohio St. 3d 259 (1991).  Of course, it is state law which determines the elements of offenses; but once the state has adopted the elements, it must then prove each of them beyond a reasonable doubt.  *In re Winship, supra.*

In cases such as Petitioner's challenging the sufficiency of the evidence and filed after enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (Pub. L. No 104-132,

110 Stat. 1214)(the "AEDPA"), two levels of deference to state decisions are required:

> In an appeal from a denial of habeas relief, in which a petitioner challenges the constitutional sufficiency of the evidence used to convict him, we are thus bound by two layers of deference to groups who might view facts differently than we would. First, as in all sufficiency-of-the-evidence challenges, we must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). In doing so, we do not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury. See *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993). Thus, even though we might have not voted to convict a defendant had we participated in jury deliberations, we must uphold the jury verdict if any rational trier of fact could have found the defendant guilty after resolving all disputes in favor of the prosecution. Second, even were we to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable. See 28 U.S.C. § 2254(d)(2).

*Brown v. Konteh,* 567 F.3d 191, 205 (6th Cir. 2009). In a sufficiency of the evidence habeas corpus case, deference should be given to the trier-of-fact's verdict under *Jackson v. Virginia* and then to the appellate court's consideration of that verdict, as commanded by AEDPA. *Tucker v. Palmer*, 541 F.3d 652 (6th Cir. 2008).

> We have made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference. First, on direct appeal, "it is the responsibility of the jury -- not the court -- to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith,* 565 U. S. 1, ___, 132 S. Ct. 2, 181 L. Ed. 2d 311, 313 (2011) (*per curiam*). And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively

unreasonable.'" *Ibid.* (quoting *Renico v. Lett*, 559 U. S. ___, ___, 130 S. Ct. 1855, 176 L. Ed. 2d 678 (2010)).

*Coleman v. Johnson*, 566 U.S. ___, ___, 132 S. Ct. 2060, 2062, (2012)(*per curiam*).

A habeas court cannot consider post-trial evidence in deciding a *Jackson v. Virginia* claim. *McDaniel v. Brown*, 558 U.S. 120 (2010).

> In order to demonstrate that the state court's decision was based on an unreasonable determination of the facts under § 2254(d)(2), a petitioner must both establish the "unreasonable determination" and show "that the resulting state court decision was 'based on' that unreasonable determination."

*Titlow v. Burt*, 680 F.3d 577, 585 (6th Cir. 2012), *cert. granted sub nom. Burt v. Titlow*, 133 S. Ct. 1457, 185 L. Ed. 2d 360 (2013), *quoting Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011).

Yarbrough presented this claim on direct appeal and the First District Court of Appeals decided the claim as follows:

> **[\*P4]** In his first assignment of error, Yarbrough argues that his conviction for the murder of Marcus Mitchell was against the manifest weight of the evidence. When reviewing the manifest weight of the evidence, an appellate court must weigh all evidence and reasonable inferences and consider the credibility of the witnesses to determine whether the trier of fact lost its way and created a manifest miscarriage of justice such that the conviction must be reversed. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997 Ohio 52, 678 N.E.2d 541 (1997).

> **[\*P5]** Yarbrough was convicted of murder under R.C. 2903.02(A), which provides that "[n]o person shall purposely cause the death of another." Yarbrough admits to shooting Mitchell, but asserts that the evidence demonstrated that he had acted in self-defense. A defendant is entitled to rely on the affirmative defense of self-defense when he establishes "(1) the defendant was not at fault in creating the violent situation, (2) the defendant had a bona fide belief that [he] was in imminent danger of death or great bodily harm and that [his] only means of escape was the use of force, and (3) that the defendant did not violate any duty to retreat or avoid the danger." *State v. Thomas*, 77 Ohio St.3d 323, 326, 1997 Ohio 269, 673 N.E.2d 1339 (1997). A defendant bears the burden of proving each element of self-defense

by a preponderance of the evidence. *State v. Miller*, 1st Dist. No. C-070691, 2008 Ohio 5899, ¶ 15.

**[\*P6]** The state presented testimony from Willie Smith, a friend of Mitchell's who had witnessed his murder. Prior to the shooting, Mitchell, who went by the nickname of "Murder," had exited from Annie's nightclub and had told Smith that "this motherfucker think I'm playing with him. I'm opting to show him I ain't playing with him." Mitchell then crossed the street and retrieved something from his car, which Smith did not view but believed to be a gun. Smith cautioned Mitchell against engaging in any sort of confrontation, but Mitchell ignored his friend's advice and approached Yarbrough in the parking lot. As Yarbrough and his friends began to walk away, Mitchell said to Yarbrough "you think I'm playing whichu?" Yarbrough responded by likewise challenging Mitchell, "you think I'm playing whichu?" He then immediately pulled a gun out of his right pocket and fired repeatedly at Mitchell. Smith testified that he had never seen Mitchell expose a gun during the altercation, and that Mitchell had tried to back up when Yarbrough had revealed his weapon.

**[\*P7]** Cincinnati Police Officer Sabreen Williams had been working an offduty detail at Annie's on the night of the shooting. She testified that, shortly after the nightclub let out for the evening, she had heard approximately seven gunshots that came from the same general area. Responding to the shots, she found Mitchell face down on the ground with no pulse. After rolling Mitchell over, Officer Williams discovered a weapon on him. Cincinnati Police Detective Kurt Ballman confirmed that a weapon had been found on Mitchell. Detective Ballman testified that Mitchell's weapon had been holstered deep inside the right side of his pants.

**[\*P8]** Marvin Gates had been at Annie's nightclub on the night of the shooting with his friend Daunte Phillips, who was struck by a stray bullet. Gates testified that he and Phillips had deliberately attempted to avoid Yarbrough in the parking lot that evening because they had seen him standing at the top of a hill flexing a weapon behind his back as Mitchell walked towards him.

**[\*P9]** At trial, Yarbrough testified that he carried a weapon for protection, even though he was not legally permitted to do so because of a prior conviction. He did so because he worked as a security guard at several area clubs and often angered people by enforcing the club rules. He further stated that he had been robbed twice at gun point and that several of his friends had been murdered.

10

**[\*P10]** Yarbrough testified that he had gone to Annie's nightclub on the night of the shooting with his friends Midnight, 80, and Kenny. As he waited in the parking lot, Mitchell approached him with a crazy look on his face, while shouting "Fuck you whore-ass nigga, I ain't perpin'. You know I ain't playing whichu." Yarbrough testified that he saw Mitchell make a reaching motion toward his pants with his right hand. Fearful that Mitchell was in the process of retrieving a weapon, Yarbrough pulled out his own weapon and fired approximately four shots at Mitchell. He explained that he chose to fire at Mitchell rather than retreat, because he had feared that he would be shot in the back if he had attempted to run. On cross-examination, Yarbrough conceded that he had never actually seen a weapon in Mitchell's possession.

**[\*P11]** Andre Whaley, also known as "Midnight," had been with Yarbrough at Annie's nightclub. Whaley witnessed Yarbrough and Mitchell arguing, and then heard Mitchell say "Fuck these niggas." He saw Mitchell reach for his side and bend his arm, and at this same time, Whaley saw Yarbrough remove his own weapon. Whaley ducked, and then heard multiple gun shots. Whaley testified that Mitchell had a reputation as a violent person, but that he had not seen a weapon in Mitchell's possession at the time that he was shot.

**[\*P12]** Following our review of the record, we hold that the evidence does not demonstrate that Yarbrough had a legitimate belief that he was in danger of imminent death or great bodily harm. Although Mitchell was found with a weapon in his possession, the record was devoid of evidence that Mitchell had actually produced that weapon during his confrontation with Yarbrough. Yarbrough himself conceded that he had not seen Mitchell display a weapon. Neither the statements uttered by Mitchell during the verbal altercation nor Mitchell's uncompleted reaching motion were enough to provide Yarbrough with a legitimate belief that he was in danger of death or great bodily harm. The trial court correctly concluded that Yarbrough had failed to prove by a preponderance of the evidence that he had acted in self-defense.

**[\*P13]** Yarbrough next argues that the record demonstrates that the trial court was not convinced of his guilt beyond a reasonable doubt. In support of his argument, he cites the length of time that it took the trial court to render a verdict, as well as an order issued by the trial court requesting the parties to research whether Yarbrough was guilty of lesser-included offenses. Yarbrough's arguments are

11

tenuous. First, the length of time that it took the trial court to issue its decision has no bearing on the weight of the evidence supporting a conviction or the confidence of the court in its decision. The record contains no indication that the trial court engaged in anything other than a thorough deliberation of the evidence.

[*P14] Further, the trial court's order requesting the parties to research lesser-included offenses was issued following a post-trial Crim.R. 33(A) motion for a new trial filed by Yarbrough. Crim.R. 33(A) provides that "[i]f the evidence shows the defendant is not guilty of the degree of crime for which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein, the court may modify the verdict or find accordingly." Rather than evince doubt in its verdict, the trial court's order demonstrates that it thoroughly considered Yarbrough's motion for a new trial, but ultimately determined that it was without merit. Yarbrough's conviction for the murder of Mitchell was not against the manifest weight of the evidence, and the first assignment of error is overruled.

[*P15] In his second assignment of error, Yarbrough argues that his conviction for the murder of Daunte Phillips was against the manifest weight of the evidence. Phillips was struck by a stray bullet that missed Yarbrough's intended victim, Marcus Mitchell. We have already determined that Yarbrough's conviction for the purposeful murder of Mitchell was supported by the manifest weight of the evidence. Under the doctrine of transferred intent, Yarbrough's conviction for the purposeful murder of Phillips was likewise supported by the weight of the evidence.

[*P16] The doctrine of transferred intent provides that "where an individual is attempting to harm one person and as a result accidentally harms another, the intent to harm the first person is transferred to the second person, and the individual attempting harm is held criminally liable as if he both intended to harm and did harm the second person." *State v. Reese,* 1st Dist. Nos. C-060576 and C-060577, 2007 Ohio 4319, ¶ 21. Here, Yarbrough's purposeful intent to kill Mitchell was transferred to Phillips.

[*P17] Yarbrough argues that the evidence fails to demonstrate that he shot Phillips, and that the deaths of Mitchell and Phillips are not related. We are not persuaded. The record contains no evidence that two separate shootings occurred. Officer Williams testified that she heard approximately seven gunshots in

succession. These gunshots came from one general area, all sounded alike, and appeared to be consecutive shots from the same weapon. Marvin Gates, Phillips' companion, testified that he and Phillips had reversed course in the parking lot after viewing Yarbrough flex a weapon behind his back. Gates heard shots ring out as he and Phillips retraced their steps. Phillips immediately announced that he was hit, and collapsed to the ground.

[*P18] Firearms examiner Robert Lenhoff examined bullets recovered during the autopsy of Marcus Mitchell as well as bullet items that had been recovered near the body of Daunte Phillips. Lenhoff testified that after comparing the characteristics of all bullets and bullet items, he had determined that they all were fired from the same weapon. Lenhoff further testified that the weapon found on Mitchell could not have fired any of the bullets recovered from the scene.

[*P19] Yarbrough further highlights discrepancies in the testimony from various state witnesses. But these discrepancies concerned minor issues. The witnesses were consistent in their relevant testimony that Yarbrough had shot Mitchell and that Mitchell had never produced a weapon during the altercation. Further, the trial court was in the best position to judge the credibility of these witnesses and to resolve any inconsistencies. The trial court did not lose its way and create a manifest miscarriage of justice in convicting Yarbrough of Phillips' murder. The second assignment of error is overruled.

*State v. Yarbrough, supra.*

**Unreasonable Determination of the Facts**

A state court decision is not entitled to deference if it is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d)(2). Yarbrough argues first that the court of appeals' decision on this claim for relief is based on an unreasonable determination of the facts in several respects. However, Yarbrough gives not a single transcript reference in support of this argument, although he has

been served with a complete copy of the trial transcript (Return of Writ, Doc. No. 6, Certificate of Service, PageID 57).


### Summary of the Evidence


Having read the trial testimony in its entirety, as requested by Yarbrough, the Magistrate Judge summaries the evidence as follows:

Sergeant Abraham Lawson of the Cincinnati Police Department testified:  On July 27, 2009, he was working an off-duty detail at Annie's nightclub (Trial Tr. attached to Return of Writ, Doc. No. 6-6, PageID 588).  At that time he supervised eight police officers who were positioned outside the club. *Id.*  at PageID 590.  A separate bar called O'Dell's is just north of Annie's front entrance.  *Id.*  at PageID 591.  There was a very large crowd at Annie's that night.  *Id.*  at PageID 592.  The officers in the detail work in pairs, but are spread out through the parking lot to provide a visible police presence.  *Id.*  at PageID 593-94.  As the club was closing, he heard multiple gunshots fired which sounded like multiple shots from the same weapon.  *Id.* at PageID 596.  The crowd then became chaotic.  *Id.*

Officer Sabreen Robinson testified as follows:  She was on the detail supervised by Sergeant Lawson on July 27, 2009, at Annie's.  *Id.*  at PageID 605-06.  When the club first let out, there was an altercation between two men which she broke up and sent them separate ways. *Id.*  at PageID 607-08.  One of them was Marcus Mitchell.  *Id.*  After breaking up another fight between two females, she heard approximately seven gunshots fired which sounded consecutive and from the same gun and same area, O'Dell's lot.  *Id.*  at PageID 609-10.  When she got to O'Dell's lot, she found Daunte Phillips in the arms of Officer Reese.  *Id.*  at PageID 610-11.  She

left Phillips and continued to walk the grounds with Officer Brown when they found Marcus Mitchell.  *Id.*  He was located at the top of O'Dell's lot and was dead when they got there.  *Id.*  Mitchell had a firearm which the police secured.  *Id.*  at PageID 612.  Officer Robinson then identified a number of photographs.  *Id.*  at PageID 619-22.

Officer Joehonny Reese testified as follows:  He was in Sergeant Lawson's detail at Annie's and near the front entrance.  *Id.*  at PageID 624.  Shortly after the crowd emptied out of Annie's, he heard "several shots."  Daunte Phillips came around the corner, approached Reese, and said he had been shot.  *Id.*  at PageID 626.  Having found the bullet wound, Reese began to administer CPR.  *Id.*  at PageID 626-27.  The situation was so chaotic and people were interfering that his partner had to pull his service weapon to cover him.  *Id.*  Reese worked on him for ten to fifteen minutes, but was unable to save his life.  *Id.*  Phillips was never able to speak to him.  *Id.*  at PageID 628.  When the fire department emergency medical personnel arrived, they confirmed that Phillips was dead.  *Id.*  at PageID 633.  Reese also identified some photographs from the scene.  *Id.*  at PageID 634-36.

Officer Martin Odom testified as follows:  He had then been a Cincinnati Police Officer for twenty-three years at that time, with the most recent three and one-half as a criminalist.  *Id.*  at PageID 645.  He responded to the crime scene about 4:00 A.M. on July 27, 2009.  *Id.*  at PageID 647-48.  It was a location he was familiar with.  *Id.*  When he arrived, officers already on the scene had marked areas of interest, mostly with traffic cones; he identified photographs of them.  *Id.*  at PageID 650-51.  He did his walk-through in conjunction with homicide investigators Kurt Ballman and David Feldhaus.  *Id.*  at PageID 652.  Officer Glindmeyer prepared a diagram of the crime scene which showed numbered placards at points of interest.  *Id.*  at PageID 654.  He recovered a Glock .40 caliber model 22 semi-automatic handgun from

Marcus Mitchell's body.  *Id.*  at PageID 664.  No weapons or other relevant evidence was located in the three vehicles towed from the scene.  *Id.*  at PageID 667.  No shell casings were found, which would lead to the inference that the shots fired came from a revolver, which does not eject casings, rather than from a semi-automatic weapon, which does.  *Id.*  at PageID 668-69.

Willie Smith testified as follows:  At the time of trial, he was incarcerated in Manchester, Kentucky, on a federal weapons charge.  *Id.*  at PageID 677.  He had an agreement that the State of Ohio would recommend a sentence reduction in return for his testimony.  *Id.*  at PageID 679. Smith knew Marcus Mitchell and was able to identify Yarbrough in court; he did not know Phillips.  *Id.*  at PageID 680-81.  He got to Annie's on the morning of July 27, 2009, close to closing time.  *Id.*  at PageID 682.  Persons entering Annie's are wanded or patted down for guns. *Id.*  at PageID 683-84.  As he left through the front door at closing time, he heard a girl yell out "they going to start shooting."  *Id.*  at PageID 685.  He was sitting with his friend when Marcus Mitchell came up to him and said "[T]his motherfucker think I'm playing with him.  I'm opting to show him I ain't playing with him."  *Id.*  at PageID 687.  Mitchell then said he would be right back and went to his car.  *Id.*   When he came back, Smith tried to get him to ignore whatever had happened and not get himself in trouble.  *Id.*  at PageID 687-88.  Mitchell did not take the advice, so Smith followed him, staying about twenty feet behind. *Id.*  at PageID 688.  Mitchell confronted Yarbrough, saying "You think I'm playing whichu [sic]?"  *Id.*  At that, Yarbrough pulled a gun from his pocket, approached Mitchell, shot him three or four times, then ran up on him and "shot him three more times in the back, kicked him, walked off."  *Id.*  at PageID 689. While Smith saw nothing in Mitchell's hand, "it wasn't too hard for me to believe that he probably went and got a gun . . ."  *Id.*  at PageID 690.  However, Smith never saw him with a gun that night or early in say he was going to shoot somebody. *Id.*   Yarbrough and Mitchell

challenged one another. Yarborough pulled out his gun and began shooting but Mitchell did not

get a chance to pull his gun. *Id.* at PageID 693. Yarborough did not warn Mitchell. *Id.* Smith

identified various points in the diagram which had been introduced in evidence. *Id.* at PageID

696-701. After the shooting, Smith went to get a police officer. *Id.* at PageID 702. Smith left

the scene but then called the police after about two hours. *Id.* at PageID 702.

Smith was arrested on October 24, 2009, on the federal weapons charge on which he was

incarcerated at the time of trial. *Id.* at PageID 707-08. He was first promised that the State

would make a recommendation on his behalf on the morning he testified. *Id.* at PageID 709. He

misidentified the person he was with on July 24 as "Ray" because he didn't want to get that

person, whose real nickname is Mike, involved in what he was doing, i.e., aiding the State. *Id.*

at PageID 711-12. Smith thought Mitchell got his gun to try to settle some kind of score with

Yarbrough. *Id.* at PageID 719.

Marvin Gates testified as follows: He knew both Yarbrough and Phillips. *Id.* at PageID

736. He was very close with Phillips. *Id.* at PageID 737. Gates had some felony cases pending

but told the prosecutor he did not need any case consideration for his testimony. *Id.* at PageID

738-39. Gates knew Yarbrough from his being a bouncer at a number of clubs. *Id.* at PageID

741. Marcus Mitchell may have broken the jaw of a rapper in a group that Yarbrough was

involved with. *Id.* at PageID 743-44.

On the night of July 28-29, 2009, Gates saw Yarbrough inside Annie's. *Id.* at PageID

745. When the club closed, Gates went out the front door. *Id.* at PageID 747. He saw

Yarbrough standing at the top of a hill with his hands behind his back and the gun in his hand.

*Id.* at PageID 748. Yarbrough was "flexing" -- trying to show people he had a gun. *Id.* When

he saw the gun, he, Phillips, and the other friend who was with them turned around, retracing

their steps. *Id.* at PageID 750. When the shots rang out, Phillips said he was hit and fell down. *Id.* PageID 753. Gates explained his testimony with the diagram. *Id.* at PageID 757-60.

Mike Lenhoff testified on behalf of the State as a firearms examiner. *Id.* at Doc. 6-7, PageID 805. He concluded after examining the bullets recovered from the scene, including those from the body of Marcus Mitchell, that they had been fired from the same revolver and not from semiautomatic weapon such as the Glock recovered from Mitchell's body. *Id.* at PageID 822-26.

Deputy Hamilton County Coroner Karen Looman testified that she was employed as a forensic pathologist. She testified without objection that Mitchell and Phillips died of gunshot wounds. *Id.* at PageID 848-50.

Darren Little, head of security at Annie's, also testified for the State. *Id.* at PageID 867. He identified Yarbrough and indicated he had known him about six years. *Id.* at PageID 869. Although Yarbrough had worked security at Annie's until about May 2009, he was not working on July 26-27, 2009. *Id.* at PageID 873. He confirmed the use of metal detector wands to prevent guns from coming into Annie's. *Id.* at PageID 876. Little had a telephone conversation with Yarbrough the morning after the shooting in which Yarbrough denied he was the shooter. *Id.* at PageID 906.

Cincinnati Police Officer Kurt Ballman testified he was a member of the homicide unit. *Id.* at PageID 920. He and Detective Feldhaus were assigned to this case when it happened and went to Annie's. *Id.* at PageID 921. He received the name of Yarbrough as a suspect from another officer at the scene. *Id.* at PageID 926. Annie's was unable to provide any video from the outside cameras for that night as it apparently was not working. *Id.* at PageID 936. He interviewed Willie Smith as a witness that night. *Id.* at PageID 938. Smith's statement that

18

night was consistent with his trial testimony.  *Id.*  at PageID 939-42.  He eventually got Marvin Gates' name from the Phillips family.  *Id.* at PageID 943.  His statement was also consistent with his trial testimony.  *Id.*  at PageID 944-46.  Gates came in to their office within several days of the shooting.  *Id.*  at PageID 947.  Eventually he interviewed Yarbrough who gave them two statements.  *Id.*  at PageID 950.  He admitted to be at Annie's that night, but not to shooting anyone. *Id.*  Yarbrough's statement was played in open court but not transcribed in the transcript. *Id.*  at PageID 957.  Yarbrough admitted he was not permitted to carry a gun because of a prior felony conviction. *Id.*  at Doc. No. 6-8, PageID 972.  Yarbrough admitted he did not see Mitchell with a gun.  *Id.*  Ballman testified Mitchell's gun was "pretty deep inside the leg of his pants." *Id.*  at PageID 973.  He had a cell phone in his hand when he was shot. *Id.*  Yarbrough told them he went to his car, retrieved a weapon, and then left right after the shooting.  *Id.*  at PageID 974. He believed Phillips was hit by a stray bullet and was not part of the incident between Mitchell and Yarbrough.  *Id.*  at PageID 1007.  The Glock found on Mitchell had been stolen from FBI Agent Moran two years prior to this incident.  *Id.*  at PageID 1011.

Yarbrough's first witness was Dante Griffin who identified himself as a cousin of Yarbrough's.  *Id.*  at PageID 1085.  Griffin was not at Annie's when the incident happened.  *Id.* at PageID 1092.  Griffin testified about some Facebook messages from someone named Mook who is the person who broke Griffin's jaw instead of Mitchell, as the State had suggested.  *Id.*  at PageID 1117-18.

The defense then called Andre Whaley who knew Yarbrough from his security work at a club called The Garage.  *Id.*  at PageID 1119-20.  He testified he was with Yarbrough at Annie's on July 26, 2009. *Id.*  He left when the club closed at 2:30 a.m. and was headed a car, as was Yarbrough. *Id.*  at PageID 1122.  He heard Mitchell say "fuck these niggas" and one of his

friends was trying to calm him down.  *Id.*  at PageID 1124-25.  At that point he saw Yarbrough get a gun.  *Id.*  at PageID 1125.  He then saw Mitchell going to his side and believed he was "reaching for his gun."  *Id.*  Whaley did not know Yarbrough had a gun that night.  *Id.*  at Doc. No. 6-9, PageID 1142.  Whaley and another person went outside to pass out fliers around 1:45 or 1:50.  *Id.*  at PageID 1144.  Yarbrough never told Whaley he was in fear and needed to protect himself.  *Id.*  at PageID 1155.  Whaley had to unlock the car for Yarbrough who got something out of the front seat. *Id.*  at PageID 1157.  Whaley then lost track of Yarbrough.  *Id.*  at PageID 1158.  If Whaley had known Yarbrough had retrieved a weapon and gone into the crowd, he would have stopped that "[b]ecause there's no use pulling a gun out when you can just go ahead and hurry up and leave if he did have an argument with someone."  *Id.*  at PageID 1166.  There were four of them in his group and Cincinnati police officers present who were close.  *Id.*  He ducked behind the car and did not see the shots fired.  *Id.*  at PageID 1167.  After the firing stopped, he drove the car with Yarbrough in it.  *Id.*  at PageID 1169.  He didn't call the police because he didn't want to be involved.  *Id.*  at PageID 1171.

Yarbrough took the stand in his own defense.  He testified about the risks of harm from people who have been ejected from clubs by bouncers.  *Id.*  at PageID 1188-96.  He admitted having a felony record and possession a firearm nonetheless.  *Id.*  at PageID 1196-97.  Annie's was filled to capacity that night.  *Id.*  at PageID 1207.  He started to leave when they turned the lights on at 2:00 a.m. *Id.*  at PageID 1208.  He was waiting for a girl he thought might leave with him. *Id.*  at PageID 1211.  He was going to the car to get his gun and phone charger because if he was leaving with the girl, he didn't want to leave his things behind.  *Id.*  at PageID 1212.

While he was standing at the car talking with one of the people he came with, he saw Marcus Mitchell approaching.  *Id.*  at PageID 1215.  Mitchell said to him "fuck you whore-ass

nigga, I ain't perpin'. He said fuck you whore-ass nigga, you perpin'. You know I ain't playing whichu." *Id.* at PageID 1216. He responded "I ain't perpin about shit." *Id.* Mitchell then reached for his side and "that's when I pulled out my weapon and fired." *Id.* After firing maybe four shots, Yarbrough got in the car and left. *Id.* at PageID 1218. He claimed he could not have gotten away. *Id.* He admitted lying to the police at first about being involved. *Id.* at PageID 1221. He claimed both Willie Smith and Marvin Gates' testimony was untrue. *Id.* at PageID 1224. He essentially admitted lying to the police by saying he came to Annie's alone "[b]ecause I didn't want to put their names in it." *Id.* at PageID 1240. When he got out of the car, he put the gun in the glove box. *Id.* at PageID 1245. He alleged he had the gun, a five-shot revolver, because someone had shot at him the week before. *Id.* at PageID 1247. Although he got the gun, he made no police report about the shooting. *Id.* at PageID 1249. He claims he had no prior argument with Mitchell. *Id.* at PageID 1261. He had his gun ready in his pocket to pull it straight out and shoot. *Id.* at PageID 1263. He did not see the cell phone in Mitchell's left hand. *Id.* at PageID 1265. He admitted to lying to Little about his involvement. *Id.* at PageID 1269-70. Yarbrough threw the gun in a dumpster so he could be as far away from it as possible. *Id.* at PageID 1272-73.


**Analysis**


The court of appeals decided Yarbrough's claims about the strength of the evidence against him on the "manifest weight of the evidence" standard. Under Ohio law, that standard is more favorable to a defendant than the constitutional standard of sufficient evidence which is applicable in habeas corpus.

In *State v. Thompkins,* 78 Ohio St. 3d 380 (1997)*,* the Ohio Supreme Court reaffirmed the

important distinction between appellate review for insufficiency of the evidence and review on

the claim that the conviction is against the  manifest weight of the evidence.    It held:

> In essence, sufficiency is a test of adequacy.  Whether the evidence
> is legally sufficient to sustain a verdict is a question of law. *State v.*
> *Robinson* (1955), 162 Ohio St. 486, 55 O.O. 388, 124 N.E.2d 148.
> In addition, a conviction based on legally insufficient evidence
> constitutes a denial of due process.  *Tibbs v. Florida* (1982), 457
> U.S. 31, 45, 102, 387 S.Ct. 2211, 2220, 72 L.Ed.2d 652, 663,
> *citing Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61
> L.Ed.2d 560.  Although a court of appeals may determine that a
> judgment of a trial court is sustained by sufficient evidence, that
> court may nevertheless conclude that the judgment is against the
> weight of the evidence.  *Robinson, supra*, 162 Ohio St. at 487, 55
> O.O. at 388-389, 124 N.E.2d at 149.  Weight of the evidence
> concerns "the inclination of the greater amount of credible
> evidence, offered in a trial, to support one side of the issue rather
> than the other.  It indicates clearly to the jury that the party having
> the burden of proof will be entitled to their verdict, if, on weighing
> the evidence in their minds, they shall find the greater amount of
> credible evidence sustains the issue which is to be established
> before them.  Weight is not a question of mathematics, but depends
> on its effect in inducing belief."  (Emphasis added.)
>
> When a court of appeals reverses a judgment of a trial court on the
> basis that the verdict is against the weight of the evidence, the
> appellate court sits as a " 'thirteenth juror' " and disagrees with the
> factfinder's resolution of the conflicting testimony.  *Tibbs*, 457
> U.S. at 42, 102 S.Ct. at 2218, 72 L.Ed.2d at 661.  See, also, *State v.*
> *Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 219, 485
> N.E.2d 717, 720-721 ("The court, reviewing the entire record,
> weighs the evidence and all reasonable inferences, considers the
> credibility of witnesses and determines whether in resolving
> conflicts in the evidence, the jury clearly lost its way and created
> such a manifest miscarriage of justice that the conviction must be
> reversed and a new trial ordered.  The discretionary power to grant
> a new trial should be exercised only in the exceptional case in
> which the evidence weighs heavily against the conviction.").

78 Ohio St. 3d at 387.  In *State v. Martin*, 20 Ohio App. 3d 172 (Hamilton Cty. 1983)(cited

approvingly by the Supreme Court in *Thompkins*), Judge Robert Black contrasted the manifest

weight of the evidence claim:

> In considering the claim that the conviction was against the manifest weight of the evidence, the test is much broader. The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. …

*Martin,* 20 Ohio App. 3d 172, ¶3 of the syllabus.  The consequences of the distinction are important for a criminal defendant.  The State may retry a case reversed on the manifest weight of the evidence;  retrial of a conviction reversed for insufficiency of the evidence is barred by the Double Jeopardy Clause.  *Tibbs v. Florida*, 457 U.S. 31, 41 (1982).

A state court finding that the verdict is not against the manifest weight of the evidence implicitly also holds that there is sufficient evidence. *Nash v. Eberlin,* 258 Fed. Appx. 761, 2007 U.S. App. LEXIS 29645 (6th Cir. Dec. 14, 2007); *Ross v. Miller*, No. 1:10-cv-1185, 2011 U.S. Dist. LEXIS 65082 (N.D. Ohio May 10, 2011)(White, M.J.); *Hughes v. Warden,* No. 1:10-cv-091, 2011 U.S. Dist. LEXIS 54131 (S.D. Ohio Apr. 27, 2011)(Merz, M.J.).  In other words, a finding that a verdict is supported by the manifest weight of the evidence – what the court of appeals found here – necessarily implies a finding that the evidence was sufficient to convict.

Most importantly, as the cited case law holds, a court considering the sufficiency of the evidence does not weigh the credibility of the witnesses.  There was evidence on each element of each of the offenses which, if believed by Judge Allen, was sufficient for conviction.  That evidence is fairly summarized in the First District's opinion. Yarbrough admitted all the facts necessary for the firearms convictions and he admitted firing his gun into the body of Marcus Mitchell intending to kill him.

Yarbrough has shown no place where the court of appeals' opinion is based on an

unreasonable reading of the evidence.  Yarbrough himself now claims that his altercation with Mitchell was "over a female patron who chose to spend her time with this petitioner."  (Reply, Doc. No. 9, PageID 1415.)  But that is not what he testified to at trial where he said he had no idea what Mitchell was angry about.  Yarbrough claims Mitchell was "known to all, even the police, as 'Murder," but the trial testimony was that Mitchell was not one of the people in the CPD nickname database with that nickname. *Id.*  Yarbrough asserts Mitchell got the nickname "due to his involvement in numerous murders in the Cincinnati area of which police had him under investigation as a suspect. . ." *Id.*  There is absolutely no trial testimony to that effect. There is not even any testimony from Yarbrough that he knew of Mitchell's supposed reputation. Yarbrough asserts Mitchell retrieved his gun from his car after leaving Annie's, which is a fair inference, given that patrons were patted down. *Id.*  at PageID 1416.  But Yarbrough admitted doing the same thing.  He claims he was getting his gun to take with him if the girl he was trying to hook up with showed up, but that is a completely uncorroborated and self-serving explanation of conduct which in itself is consistent with an intent to confront Mitchell.

Yarbrough claims he "turned himself in to the police and fully cooperated." *Id.*  at PageID 1417.  But on the witness stand he admitted disposing of the gun, lying to Little about his involvement, failing to identify other witnesses, and lying to police in his first statement.  That is hardly full cooperation and his admitted lies could well have been taken into account by Judge Allen in assessing his credibility.

Yarbrough does not dispute the Ohio doctrine of transferred intent in respect to the killing of Phillips.  He just says it could not have been him and invents another shooter with an unknown motive to kill Phillips who happened to fire at exactly the same time and then escaped and remains at large.  None of this hypothesis is supported by trial testimony.  What Judge Allen

did have in front of her was testimony from the firearms examiner that the bullets which killed Mitchell and the bullet which killed Phillips came from the same gun.

Yarbrough makes much of Judge Allen's delay in rendering the verdict, but it is unclear what that is supposed to prove. Judge Allen had been a judge for more than twenty years when she tried this case. If she says she was persuaded beyond a reasonable doubt, her delay in deciding proves nothing to the contrary. The scheduling concerns Judge Allen expresses to counsel at various points in the transcript show she had a number of murder trials with juries backed up behind this trial. In a bench trial, the trial judge is under no obligation to decide with the kind of speed a jury must use: once a case is given to the jury to decide, they cannot do anything else until they have reached a verdict or the case is mistried. A trial judge considering a verdict in a bench trial likely has many other matters which have been awaiting her attention while she was in trial

Yarbrough's claim on Ground One is essentially that his proof of self-defense is so strong that no reasonable trier of the facts could have failed to accept it. But that is simply not so. If, as he now says, he believed Mitchell followed him from Annie's to pursue the argument over a woman, he could have fled or taken advantage of the ample police protection which he knew was available in the parking lot. Instead, he went to get his gun and confront Mitchell. While there is some evidence on some of the elements of self-defense, it is not so overwhelming that it had to be believed.

The Warden defends on Ground One by asserting that a self-defense claim is not cognizable in habeas corpus on an insufficiency of the evidence ground for relief because it is an affirmative defense and does not, even if fully proved, negate any of the elements of the offense of conviction (Return of Writ, Doc No. 6, PageID 39-40, *citing Black v. Ohio*, 2010 U.S. Dist.

LEXIS 31904 (S.D. Ohio 2010)(Black, M.J.))  Judge Black relied further on *Caldwell v. Russell*, 181 F.3d 731 (6th Cir. 1999), where the Sixth Circuit held "[T]he due process 'sufficient evidence' guarantee does not implicate affirmative defenses, because proof supportive of an affirmative defense cannot detract from proof beyond a reasonable doubt that the accused had committed the requisite elements of the crime."  *Id.*  at 740, *citing Allen v. Redman*, 858 F.2d 1194 (6th Cir. 1988).  Ohio Revised Code § 2901.05(A) places the burden on a defendant to prove self-defense by a preponderance of the evidence.  Allocating the burden of production and proof in that way is constitutional.  *Martin v. Ohio,* 480 U.S. 228 (1987).

Ground One for Relief should be dismissed with prejudice.

## Ground Two:  Ineffective Assistance of Counsel

In his Second Ground for Relief, Yarbrough asserts his trial attorney provided ineffective assistance of trial counsel by not cross-examining the coroner and the firearms expert vigorously enough. This claim was presented to the court of appeals which decided it as follows:

The governing standard for ineffective assistance of counsel is found in *Strickland v. Washington*, 466 U.S. 668 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687.

With respect to the first prong of the *Strickland* test, the Supreme Court has commanded:

> Judicial scrutiny of counsel's performance must be highly deferential. . . .  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

466 U.S. at 689.

As to the second prong, the Supreme Court held:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to overcome confidence in the outcome.

466 U.S. at 694.  *See also Darden v. Wainwright*, 477 U.S. 168 (1986); *Wong v. Money,* 142 F.3d 313, 319 (6th Cir. 1998); *Blackburn v. Foltz*, 828 F.2d 1177 (6th  Cir. 1987).  *See generally* Annotation, 26 ALR Fed 218.

Yarbrough presented this claim as his third assignment of error on direct appeal and the First District decided it as follows:

> **[*P20]** In his third assignment of error, Yarbrough asserts that he received ineffective assistance from his trial counsel. For counsel to be deemed ineffective, the defendant must demonstrate that counsel's performance was deficient and that the defendant was prejudiced by the deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A defendant is only prejudiced if the outcome of the proceedings would have been different but for counsel's deficient performance. *Id.* at 694. When reviewing counsel's performance,

27

this court must engage in the presumption that counsel's behavior fell within the range of reasonable professional assistance. *Id.* at 689.

**[\*P21]** Yarbrough argues that his counsel was ineffective in focusing on the affirmative defense of self-defense with respect to Daunte Phillips and in failing to independently pursue additional evidence relating to Phillips' death. But pursuing such a defense is a matter of trial strategy, which this court will generally refrain from second guessing. *State v. Myles,* 1st Dist. No. C-050810, 2007 Ohio 3307, ¶ 73. In this case, arguing self-defense was a sound trial strategy based on the evidence presented. Had Yarbrough been acquitted of Mitchell's murder based on self-defense, he would have likewise been acquitted of Phillips' murder.

**[\*P22]** Yarbrough further argues that his counsel failed to effectively cross-examine both the coroner and the firearms examiner about Phillips' cause of death and the type of weapon used to shoot Phillips. We do not find that counsel's examination of these witnesses was deficient. Given the pursued strategy of self-defense and the information already elicited on direct examination, we fail to see how additional testimony from the coroner regarding Phillips would have aided Yarbrough. And the record indicates that defense counsel vigorously cross-examined the firearms examiner on the type of weapon used to fire both the bullets recovered from Mitchell's body and the bullet items found near Phillips.

**[\*P23]** Yarbrough did not receive ineffective assistance from his trial counsel. The third assignment of error is overruled.

*State v. Yarbrough, supra.*

Yarbrough has failed to demonstrate that this decision is contrary to or an objectively unreasonable application of *Strickland, supra.* First of all, he argues he is entitled to de novo review because the court of appeals analyzed only the deficient performance prong of *Strickland* (Reply, Doc. No. 9, PageID 1426). That is a misunderstanding of *Strickland.* To prevail on an ineffective assistance of trial counsel claim, a defendant must show both deficient performance and prejudice. *Berghuis v. Thompkins,* 560 U.S. 370, ___, 130 S.Ct. 2250, 2264 (2010), *citing Knowles v. Mirzayance,* 556 U.S. 111 (2009).

28

Yarbrough's claims of prejudice are conclusory and speculative.  He claims "a simple logistic attack on the Phillips conviction would have successfully gotten that charged eliminated." (Reply, Doc. No. 9, PageID 1426.)  But his counsel was faced with an expert opinion from a firearms examiner that the bullets that killed both men came from the same gun. How would a "logistics" attack (whatever that means) have dispelled that testimony?  Yarbrough does not even begin to suggest what more vigorous cross-examination of the deputy coroner would have produced.  She testified Phillips died of a gunshot wound.  What other cause of death a more vigorous cross would have produced is not even suggested.

A review of the entire transcript shows an aggressive defense by both defense counsel and lenience toward them by Judge Allen which other judges might not have permitted.  They did not provide ineffective assistance of trial counsel in the manner Yarbrough argues and his Second Ground for Relief should be dismissed with prejudice.


**Ground Three:  Prosecutorial Misconduct**


In his Third Ground for Relief, Yarbrough claims the prosecutors improperly compensated Willie Smith and Marvin Gates for their testimony and then failed to reveal that compensation in violation of their obligation under *Brady v. Maryland*, 373 U.S. 83 (1963).

The State has a duty to produce exculpatory evidence in a criminal case.  If the State withholds evidence and it is material, the conviction must be reversed.  *Brady v. Maryland*, 373 U.S. 83 (1963).  "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."

*United States v. Bagley*, 473 U.S. 667, 683 (1985). "The proper *Brady* inquiry is whether the cumulative effect of the withheld evidence leads us to conclude that there is a reasonable probability that the result of the trial would have been different." *Apanovitch v. Bobby*, 648 F.3d 434, 441 (6th Cir. 2011), *citing Doan v. Carter*, 548 F.3d 449, 460 (6th Cir. 2008). In addition, an evaluation of the question of prejudice requires consideration of all the relevant evidence that the factfinder would have had if the withheld evidence had been disclosed, including any evidence that might have been derived from the withheld material. *Wong v. Belmontes*, 558 U.S. 15, 19-20 (2009).

Yarbrough presented this claim on direct appeal and the First District decided it as follows:

> **[*P24]** In his fourth assignment of error, Yarbrough asserts that the prosecutor engaged in prosecutorial misconduct by failing to disclose material information in violation of the Confrontation Clause, Crim.R. 16, and his due process and Fifth Amendment rights. The misconduct of a prosecutor will only serve as grounds for reversal if it deprived the defendant of a fair trial. *State v. Maurer*, 15 Ohio St. 3d 239, 266, 15 Ohio B. 379, 473 N.E.2d 768 (1984).

> **[*P25]** Yarbrough contends that the prosecutor committed misconduct by failing to disclose prior to trial the case consideration that state witness Willie Smith would receive in return for his testimony. During trial, Smith testified that he was currently incarcerated in Kentucky on assault-weapons charges, and that the prosecutor would make a recommendation to his sentencing judge in that case in return for testimony against Yarbrough. Defense counsel cross-examined Smith on the consideration that he would receive. Yarbrough now argues that this information was subject to discovery pursuant to Crim.R. 16, and that the state failed to disclose this information in violation of his constitutional rights under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We are not persuaded that the failure to obtain this information at an earlier time deprived Yarbrough of a fair trial. Yarbrough's counsel cross-examined Smith on this issue, and the trial court was aware that Smith stood to gain a reduced sentence in return for his testimony. The court was able to consider such information when determining Smith's

credibility. *State v. O'Dell*, 45 Ohio St.3d 140, 142-143, 543 N.E.2d 1220 (1989).

**[\*P26]** Yarbrough raises similar allegations with respect to the state's witness Marvin Gates. During trial, the prosecutor asked Gates if he was receiving any case consideration in return for his testimony against Yarbrough. Gates responded "I told you I didn't need—I didn't want you guys to help me out of my case, I can help my own case myself, me and my lawyer been doing. So I don't need no help, no idea, no case consideration." Gates stated that he was testifying because Phillips was like his brother and he couldn't see his killer walk.

**[\*P27]** In a post-trial motion for a new trial and/or motion for judgment of acquittal, Yarbrough alleged that Gates had in fact received case consideration on pending charges after his testimony had been given. Yarbrough attached documents to his motion purporting to demonstrate that Gates later obtained the dismissal of several pending charges and a reduction in other charges. Yarbrough alleges that the state's failure to reveal the beneficial treatment given to Gates violated his rights under the Confrontation Clause, the due process clause of the Fifth Amendment, and the progeny of case law developed from *Brady v. Maryland*.

**[\*P28]** Yarbrough's argument is without merit. Gates testified that he neither desired nor had received case consideration in return for his testimony. And while Gates later entered into a plea deal with the state, the record contains no evidence that such a deal was granted in return for testimony against Yarbrough. This court would have to engage in pure speculation to reach such a conclusion. During trial, Gates was questioned extensively regarding any potential case consideration and his motivations for testifying. The court was made aware of Gates' relationship with the victim and Gates' desire that Phillips' killer not go unpunished. Defense counsel further elicited on cross-examination that the prosecutor had agreed to Gates' release on bond on unrelated charges prior to Yarbrough's trial. The court was again able to consider such information when assessing Gates' credibility and determining what weight to give his testimony.

**[\*P29]** We overrule Yarbrough's fourth assignment of error because he has failed to demonstrate any improper conduct by the prosecutor that deprived him of a fair trial.

*State v. Yarbrough, supra.*

Because of its usefulness in impeachment, any consideration offered to a witness for his testimony should be revealed under *Brady*.  Even in a civil case, where *Brady* is not applicable, an expert witness must reveal the amount of his compensation for testimony.  But with respect to Willie Smith, the case consideration he was to receive was revealed and made the basis of cross-examination.  Wendy Calaway, one of Yarbrough's trial attorneys, admitted as much in the Motion for New Trial (Return of Writ, Doc. No. 6-1, PageID 115).  Thus there was no *Brady* violation.  To the extent the claim is that this was not revealed early enough, it is unavailing.  No *Brady* claim exists for adverse impact on trial preparation; "only the effect on the trial's outcome matters." *Webb. v. Mitchell*, 586 F.3d 383, 391 (6th Cir. 2009), *quoting Wilson v. Parker*, 515 F.3d 682, 702 (6th Cir. 2008).

Marvin Gates testimony at trial was that he neither wanted nor had he received any case consideration for his testimony.  As the court of appeals noted, he did in fact receive case consideration after he testified.  Defense counsel knew of the pending charges and certainly could have asked if any promises had been made.  Mr. Ellsworth extensively cross-examined Gates on any bond consideration he may have received, but he denied it had any relationship to his testimony.  (Trial Tr., Return of Writ, Doc. No. 6-6, PageID 769-72).  The much more seriously impeaching facts about Gates were the depth of his relationship with Daunte Phillips and those facts were thoroughly revealed.

When a case has been tried to the bench and then *Brady* material is presented to the same factfinder in a motion for new trial and she says it would not have affected her decision – which is what happened in this case – it is near impossible for a defendant to show the outcome would have been different because appellate and habeas courts do not have to analyze what impact the

information would have had on a jury.  Instead, they know it would not have probably affected the outcome.

Yarbrough claims the sentencing transcripts of both Smith and Gates show they received case consideration beyond what was revealed to the defense:  "The court of appeals also said the record contains no evidence that the deals Gates or Smith got was the result of their testimony. First the sentencing transcripts belie that claim.  The new trial motion had that evidence attached."  (Reply, Doc. No. 9, PageID 1428.)  However, no sentencing transcripts are referred to in the Motion for New Trial or attached to it (See Return of Writ, Doc. No. 6-1, PageID 115-16).

Yarbrough's Third Ground for Relief is without merit and should be dismissed with prejudice.


## Ground Four:  Involuntary Waiver of Jury Trial


In his Fourth Ground for Relief, Yarbrough claims his waiver of trial by jury was involuntary.

Trial by jury is, of course, fundamental to American criminal jurisprudence and constitutionally required in any case where the penalty may be in excess of six months imprisonment .  See *Duncan v. Louisiana,* 391 U.S. 145, 149 (1968).  The purpose of the jury trial is to prevent governmental oppression and arbitrary law enforcement. *Id.* at 155.  The jury trial gives the defendant "an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge."  *Apprendi v. New Jersey,* 530 U.S. 466, 548 (2000), *citing, Duncan,* 391 U.S. at 156.  Trial by jury may be waived only where the defendant's waiver is voluntary, knowing, and intelligent.  See *Patton v. United States,* 281 U.S.

276 (1930),  abrogated on other grounds, *Williams v. Florida,* 399 U.S. 78 (1970).

A jury trial may be waived upon the express and intelligent consent of the defendant. *Sowell v. Bradshaw*, 372 F.3d 821 (6th Cir. 2004), *citing Patton*, 281 U.S. at 312-13, *Williams v. Florida,* 399 U.S. 78 (1970). Although the courts will not presume a waiver from a silent record, the burden of demonstrating that a waiver was not valid lies with the defendant who made the waiver.  *Id.*, *citing Adams v. United States ex rel. McCann,* 317 U.S. 269, 281 (1942).  A colloquy regarding the waiver is not constitutionally required.  *Sowell,* 372 F.3d at 832-34, *distinguishing United States v. Martin*, 704 F.2d 267 (6th Cir. 1983).  Similarly, a written waiver is not constitutionally required.  *Fitzgerald v. Withrow,* 292 F.3d 500, 504 (6th Cir. 2002)(citation omitted). However, a written waiver is presumptively voluntary, intelligent, and knowing.  *State v. Fitzpatrick*, 102 Ohio St. 3d 321, 326 (2004), *citing United States v. Sammons,* 918 F.2d 592, 597 (6th Cir. 1990).

Yarbrough presented this claim to the First District which decided it as follows:

> **[\*P30]** In his fifth assignment of error, Yarbrough argues that his jury waiver was not made knowingly, intelligently, or voluntarily. He contends that, had he been made aware of the case consideration received by state's witnesses Smith and Gates, he would not have waived his right to a trial by jury.

> **[\*P31]** R.C. 2945.05 states that a defendant may waive a trial by jury, provided that the waiver is made in open court and in writing, is signed by the defendant after having an opportunity to consult with counsel, and is filed and made part of the record.[1] The Ohio Supreme Court reiterated these requirements in *State v. Lomax*, 114 Ohio St.3d 350, 2007 Ohio 4277, 872 N.E.2d 279, paragraph one of the syllabus. The record indicates that these requirements were all complied with in the present case.

> **[\*P32]** When determining whether a jury waiver was made knowingly, intelligently, and voluntarily, we must consider the circumstances at the time that the waiver was made and determine whether the mandated requirements were met. It is not possible for

---

[1] None of these requirements is imposed on the States as a matter of federal constitutional law.

a defendant to know at the time that a jury waiver is executed the exact testimony that each witness will provide. An argument that a defendant's jury waiver is rendered involuntary any time surprising or previously unknown testimony is elicited at trial is simply unreasonable. Further, in our resolution of the preceding assignment of error, we have already determined that the state did not commit any improper conduct that deprived Yarbrough of a fair trial with respect to the potential case consideration received by its witnesses.

**[\*P33]** The record demonstrates that Yarbrough executed a knowing, voluntary, and intelligent waiver of his right to a trial by jury. The fifth assignment of error is overruled.

*State v. Yarbrough, supra.*

Yarbrough claims his jury trial waiver was not knowing, intelligent, and voluntary because "he did not have all the relevant information he was entitled to." (Reply, Doc. No. 9, PageID 1429, *citing United States v. Martin*, 704 F.2d 267 (6th Cir. 1983)). In *Martin* the Sixth Circuit upheld a jury waiver against a claim that it was not knowing, intelligent, and voluntary. Aside from reiterating the standard for a waiver, *Martin* is not helpful to Yarbrough's cause.

The information Yarbrough claims was missing was of the "deals [the State] made with it's [sic] key witnesses Gates and Smith." *Id.* at PageID 1428. As the court of appeals pointed out, making the voluntariness of a jury waiver turn on whether "surprising or previously unknown" testimony is not revealed is completely unworkable. The right to trial of any kind can be waived by pleading guilty with far less information than that. If that were the test, a defendant could get a "trial run" in a bench trial and then start over if some evidence he did not know about turned up at trial. In any event, Yarbrough points to no clearly established decision of the United States Supreme Court which requires this result.

Yarbrough's Fourth Ground for Relief should be dismissed with prejudice.

**Ground Five:  Denial of  New Trial**

In his Fifth Ground for Relief, Yarbrough asserts he was deprived of due process of law when Judge Allen denied his Motion for New Trial.  He presented this claim on direct appeal and the First District decided it as follows:

> **[\*P34]** In his sixth assignment of error, Yarbrough argues that the trial court erred by overruling his motion for a new trial based on newly discovered evidence. Yarbrough's alleged newly discovered evidence was the testimony of Kenneth Davis, an eyewitness to Mitchell's murder.
>
> **[\*P35]** Pursuant to Crim.R. 33(A)(6), a motion for a new trial may be granted when "new evidence material to the defense is discovered, which the defendant could not with reasonable diligence have discovered and produced at trial." To warrant the granting of a new trial, it must be shown that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence. *State v. Petro*, 148 Ohio St. 505, 76 N.E.2d 370 (1947), syllabus.
>
> **[\*P36]** Yarbrough provided an affidavit from Davis detailing the newly discovered information that Davis would provide. According to Davis' affidavit, he witnessed the shooting death of Marcus Mitchell outside Annie's. Davis saw Mitchell approach Yarbrough and reach for a gun during the confrontation. Davis additionally stated that he had seen a gun located in Mitchell's pants. The trial court denied Yarbrough's motion for a new trial. It found that this evidence could have been discovered prior to trial with the exercise of reasonable diligence, and that the evidence would have been merely cumulative to other evidence adduced at trial.
>
> **[\*P37]** We review the trial court's ruling on a motion for new trial for an abuse of discretion. *Id.* at 507-508. An abuse of discretion entails more than an error in law or in judgment. Rather, it involves an unconscionable, unreasonable, or an arbitrary attitude on the part of the trial court. *Pembaur v. Leis,* 1 Ohio St. 3d 89, 91, 1

Ohio B. 125, 437 N.E.2d 1199 (1982). Here, we hold that the trial court did not abuse its discretion in denying Yarbrough's motion.

[*P38] The record indicates that, during Yarbrough's initial interview with the police, he informed them that Davis had been one of his companions at Annie's on the night of the shooting. He had further provided the police with a cellular telephone number for Davis. Given this information, we find that Davis' statement could have been discovered with the exercise of due diligence prior to trial. We further find that this evidence would merely impeach or contradict testimony provided by other witnesses. Yarbrough, Willie Smith, and Andre Whaley each testified that they had not seen a weapon on Mitchell when he was shot by Yarbrough. Davis' statement that a weapon had in fact been visible on Mitchell is in direct contradiction to the testimony of these witnesses.

[*P39] Yarbrough further argues that his motion for a new trial should have been granted because his convictions were not supported by sufficient evidence and because the prosecutor committed misconduct by failing to disclose the case consideration that two of its witnesses had received in return for their testimony. We have already determined that these arguments are meritless. We again hold that Yarbrough's convictions were supported by the sufficiency and the weight of the evidence, and that the prosecutor committed no misconduct that deprived Yarbrough of a fair trial. The trial court did not abuse its discretion in denying Yarbrough's motion on these grounds. The sixth assignment of error is overruled.

*State v. Yarbrough, supra.*

The Warden defends this claim on the grounds it does not state a claim for relief cognizable in federal habeas corpus because it is based on Ohio law. That is, Ohio law grants a right to a new trial under the circumstances described in Ohio R. Crim. P. 33. Whether or not an Ohio trial judge correctly decided such a motion is reviewed for abuse of discretion under Ohio law. But the claim that a trial judge abused her discretion on a new trial motion is not a claim arising under the United States Constitution. See *Sinistaj v. Burt,* 66 F.3d 804, 808 (6th Cir. 1995), cited at Return of Writ, Doc. No. 6, PageID 65.

Yarbrough responds that denial of a new trial motion does violate the Constitution if it renders the underlying proceeding fundamentally unfair. (Reply, Doc. No. 9, PageID 1430, *citing Walker v. Engle,* 703 F.2d 959 (6th Cir. 1983)).  *Walker* does not hold that failure to grant a new trial is a cognizable constitutional claim.  Indeed in that case the habeas petitioner was attempting to prevent a new trial on Double Jeopardy grounds.

Assuming there might be a case where failure to grant a new trial made a conviction fundamentally unfair, this is not such a case.  Yarbrough's Motion for New Trial was based primarily on the proffered testimony of Kenneth Davis.  Yarbrough offers no response to the state court finding that he revealed Davis' identity, including a cellphone number, to the police in his initial interview.  Yarbrough's Affidavit was signed May 2, 2011, and had obviously been prepared for signature sometime in April 2011 (Affidavit, Return of Writ, Doc. No. 6-1, PageID 120).  It was notarized by trial attorney Wendy Calaway.  In her own Affidavit she avers

> Defense counsel was unavoidably prevented from obtaining any information from Mr. Davis until late April, 2011.  Although there were reports and information that Mr. Davis may have been present on the night in question, none of the people myself nor my investigator interviewed could uncover Mr. Davis' contact information.  Mr. Davis only learned that Mr. Yarbrough had been tried in this case, after the trial was over.

(Affidavit, Doc. No. 6-1, PageID 120.)  Based on the trial testimony, Judge Allen had good reason to be skeptical of this claim.  Davis was no stranger to Yarbrough – he was close enough to him to be able to swear that Yarbrough's purpose in retrieving the gun from the car in which they both arrived and both left together was that "he was planning to leave with someone else."[2] Judge Allen also found David was locked up in the Hamilton County Justice Center twice during the time Yarbrough was there awaiting trial and was on probation as of the time of trial (Entry,

---

[2] He does not say how he knew all this.  The Affidavit bears the marks associated with such documents:  carefully constructed post-trial testimony obviously designed to rebut or bolster very specific trial testimony.

Return of Writ, Doc. No. 6-1, PageID 157).

Denial of the Motion for New Trial did not result in Yarbrough's conviction being the result of a fundamentally unfair proceeding. His Fifth Ground for Relief should be denied with prejudice.


**Conclusion**


Based on the foregoing analysis, it is respectfully recommended that the Petition herein be dismissed with prejudice. Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability and the Court should certify to the Sixth Circuit that any appeal would be objectively frivolous.


Jul 21 2014 2:59 PM

X

Michael R. Merz


**NOTICE REGARDING OBJECTIONS**


Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such

portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 153-55 (1985).